IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

UNITED STATES OF AMERICA,      )
                               )
        Plaintiff,             )
                               )        Civil Action No. 2:24-cv-07522-DCN
        v.                     )
                               )
LANXESS CORPORATION,           )
                               )
        Defendant.             )
                               )

## COMPLAINT

The United States of America, by authority of the Attorney General of the United States, and at the request of the Administrator of the United States Environmental Protection Agency ("EPA"), through the undersigned attorneys, files this Complaint and alleges as follows:

## NATURE OF THE ACTION

1.      This is a civil action brought against Defendant LANXESS Corporation ("Defendant") for the assessment of civil penalties and injunctive relief for violations of the Clean Air Act (the "Act"), 42 U.S.C. §§ 7401 to 7671q, and its implementing regulations at Defendant's chemical manufacturing facility, located at 2151 King Street Extension, Charleston, South Carolina (the "Facility").

2.      Defendant has violated the Act and its implementing regulations at the Facility by, among other things, failing to: (1) properly identify and monitor equipment that has the potential to leak hazardous air pollutants; (2) properly control and monitor wastewater treatment processes; (3) properly calculate the status of batch process vents, and (4) adhere to

recordkeeping requirements.  The United States seeks (1) injunctive measures to bring the Facility into compliance with the Act and its implementing regulations; and (2) an appropriate civil penalty.

## JURISDICTION AND VENUE

3.    This Court has jurisdiction over the subject matter of this action and Defendant, pursuant to 28 U.S.C. §§ 1331, 1345, and 1355, and 42 U.S.C. § 7413(b).

4.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1391 and 1395 and 42 U.S.C. § 7413(b), because the Facility is located in, and the claims arose from within, this judicial district.

## NOTICE

5.    The United States has provided notice of the commencement of this action to the State of South Carolina as required by Section 113(b) of the Act, 42 U.S.C. § 7413(b).

## AUTHORITY

6.    The United States Department of Justice has authority to bring this action on behalf of the Administrator of the EPA pursuant to 28 U.S.C. §§ 516 and 519 and Section 305(a) of the Act, 42 U.S.C. § 7605(a).

## DEFENDANT

7.    Defendant is a corporation organized and existing under the laws of Delaware and licensed to do business in South Carolina.

8.    Defendant is a "person" within the meaning of 42 U.S.C. § 7602(e).

9.    Since February 7, 2018, Defendant has owned and operated the Facility, which produces specialty chemicals.

## STATUTORY AND REGULATORY BACKGROUND

10.    Congress enacted the Clean Air Act to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population.  42 U.S.C. § 7401(b)(1).

11.    The Act sets forth a national program for the control of hazardous air pollutants ("HAPs") and includes a list of 188 HAPs established by Congress.  42 U.S.C. § 7412(b)(1).

12.    The Act requires the EPA Administrator to promulgate regulations establishing emission standards for categories of major sources of HAPs.  42 U.S.C. § 7412(d)(1).  A major source is a stationary source that emits or has the potential to emit 10 tons or more per year of any single HAP or 25 tons or more per year of any combination of HAPs.  42 U.S.C. § 7412(a)(1).  The emission standards must provide for the maximum degree of reduction in emissions as determined by the Administrator.  42 U.S.C. § 7412(d)(2), (3).

13.    The EPA Administrator must publish a list of all categories and subcategories of major sources of HAPs.  42 U.S.C. § 7412(c).  A "category" of sources is a group of sources having some common features suggesting that they should be regulated in the same way and on the same schedule.  57 Fed. Reg. 31,576, 31,578 (July 16, 1992).

14.    Once a category is on the list, EPA must promulgate federal emission standards for each category or subcategory of major sources of HAPs.  42 U.S.C. § 7412(d)(1).  These emission standards represent the maximum achievable control technology ("MACT"), as determined by EPA under Section 112(d) of the Act, and are often called the "MACT standards." The MACT standards are contained in Part 63 of Title 40 of the Code of Federal Regulations.

15.    An "affected source" is the collection of equipment or activities within a single contiguous area and under common control that is included in a source category for which a

3

MACT standard is established.  40 C.F.R. § 63.2.  Each MACT standard defines the relevant affected source or sources within a facility to which the MACT applies.

16.     Subject to an exception not applicable here, after the effective date of any emission standard, limitation, or regulation promulgated pursuant to Section 112 of the Act, no person may operate a source in violation of the standard, limitation, or regulation.  42 U.S.C. § 7412(i)(3).

<u>**MACT for Miscellaneous Organic Chemical Manufacturing**</u>
<u>**(40 C.F.R. Part 63, Subpart FFFF)**</u>

17.     Pursuant to 42 U.S.C. § 7412(c), in 2002, EPA identified Miscellaneous Organic Chemical Manufacturing as a category of major sources that emit or may emit HAPs.  67 Fed. Reg. 16,154 (April 4, 2002).  In 2003, EPA promulgated the National Emission Standards for Hazardous Air Pollutants ("NESHAP") for Miscellaneous Organic Chemical Manufacturing in 40 C.F.R. Part 63, Subpart FFFF.  40 C.F.R. §§ 63.2430–63.2550 and associated tables.  These provisions commonly are referred to as "Subpart FFFF," "Miscellaneous Organic NESHAP," or the "MON."  68 Fed. Reg. 63,852 (Nov. 10, 2003).  The compliance date for existing sources was May 10, 2008.

18.     Owners or operators of miscellaneous organic chemical manufacturing process units ("MCPUs") that are located at, or are part of, a major source of hazardous air pollutants, must comply with the standards of the MON.  40 C.F.R. § 63.2435.

19.     An MCPU includes equipment necessary to operate a miscellaneous organic chemical manufacturing process that satisfies the following conditions: (1) the MCPU produces material or a family of materials that is an organic chemical classified using the 1987 version of the Standard Industrial Classification ("SIC") code 286; (2) the MCPU processes, uses, or

generates a HAP; and (3) the MCPU is not an affected source or part of an affected source under another subpart of Part 63.  40 C.F.R. § 63.2435(b).

20.     A "miscellaneous organic chemical manufacturing process" means all equipment that collectively functions to produce a product or isolated intermediate product that is specifically described in 40 C.F.R. § 63.2435(b).  40 C.F.R. § 63.2550.  For purposes of the MON, "process includes any, all, or a combination of reaction, recovery, separation, purification, or other activity, operation, manufacture, or treatment used to produce a product or isolated intermediate."  40 C.F.R. § 63.2550.

21.     The "affected source" to which the standards of the MON apply is the facility-wide collection of MCPUs and heat exchange systems, wastewater, and waste management units that are associated with manufacturing materials described in 40 C.F.R. § 63.2435(b)(1), and that meet the requirements of 40 C.F.R. § 63.2435(b)(2) and (3).  40 C.F.R. § 63.2440(b).

22.     Owners or operators of affected sources subject to the MON must also comply with certain requirements of the General Provisions of the NESHAP contained in 40 C.F.R. Part 63, Subpart A, including 40 C.F.R. § 63.6(e).  40 C.F.R. Part 63, Subpart FFFF, Table 12.  At all times relevant to this Complaint, the General Provisions required the owners or operators of an affected source subject to the MON to operate and maintain the source, including associated air pollution control equipment, in a manner consistent with good air pollution control practices, including periods of startup, shutdown, and malfunction.  40 C.F.R. § 63.6(e).

23.     The MON sets forth emission limits, work practice standards, and compliance requirements for affected sources, including but not limited to (1) leaks of hazardous air pollutants from equipment, 40 C.F.R. § 63.2480; (2) standards for wastewater streams, 40 C.F.R.

§ 63.2485; and (3) standards for batch process vents, 40 C.F.R. §§ 63.2460(a)–(b).  The MON

also sets forth reporting and recordkeeping requirements.  40 C.F.R. §§ 63.2520, 63.2525.

<u>*MON Requirements for Equipment Leak Detection and Repair*</u>

24.     The owner or operator of an affected source must comply with each equipment

leak requirement in Table 6 to the MON that applies to its equipment.  40 C.F.R. § 63.2480(a).

Equipment means each pump, compressor, agitator, pressure relief device, sampling connection

system, open-ended valve or line, valve, connector, and instrumentation system in organic HAP

service; and any control devices or systems used to comply with Table 6 to the MON.  40 C.F.R.

§ 63.2550(i).

25.     Owners or operators of equipment "in organic HAP service" that is part of any

MCPU must comply with one of three options to control equipment leaks.  40 C.F.R. Part 63,

Subpart FFFF, Table 6.  "In organic HAP service" means the equipment contains or contacts a

fluid that is at least 5% by weight of total organic HAPs, as determined under 40 C.F.R.

§ 63.180(d).  40 C.F.R. § 63.2550(i).

26.     One compliance option for the owner or operator is to comply with the

requirements of 40 C.F.R. Part 63, Subpart UU (National Emission Standards for Equipment

Leaks – Control Level 2 Standards).  Subpart UU applies to equipment that contains or contacts

regulated material, which includes HAPs.  40 C.F.R. § 63.1019(b).

27.     Owners and operators must comply with Method 21 of 40 C.F.R. Part 60,

Appendix A-7 ("Method 21"), when monitoring regulated equipment.  40 C.F.R § 63.1023(b)(1).

28.     Among other things, owners or operators must (1) identify equipment subject to

the provisions of Subpart UU, 40 C.F.R. §§ 63.1022 and 63.1038(b)(1); (2) monitor equipment at

specific intervals and calibrate monitoring instruments, as set forth in 40 C.F.R. § 63.1023(b) and

Method 21; (3) monitor pumps and agitators monthly, as required by 40 C.F.R. §§ 63.1026(b)

and 63.1028(c); and (4) visually inspect pumps and agitators weekly to check for indications of liquids dripping, as set forth in 40 C.F.R. §§ 63.1023(a)(2)(i), (iii).

*MON Requirements for Wastewater Streams*

29.     The owner or operator of an affected source with wastewater streams must comply with each requirement in Table 7 of Subpart FFFF that applies to its wastewater streams. 40 C.F.R. § 63.2485(a).  A wastewater stream is a stream that includes only water discarded from an MCPU or control device through a "point of determination" and that contains either: (1) an annual average concentration of at least 5 parts per million by weight ("ppmw") of compounds listed in Tables 8 and 9 of Subpart FFFF, and has an annual average flowrate of 0.02 liters per minute or greater; or (2) an annual average concentration of at least 10,000 ppmw of compounds listed in Tables 8 and 9 of Subpart FFFF at any flow rate.  40 C.F.R. § 63.2550(i).

30.     The compounds listed in Tables 8 and 9 of Subpart FFFF are those that are soluble or partially soluble and have the potential to volatilize from water to the atmosphere.  68 Fed. Reg. 63,862 (Nov. 10, 2003).

31.     A "point of determination" means each point where process wastewater exits an MCPU or a control device.  40 C.F.R. § 63.2550(i).

32.     "Process wastewater" means "wastewater which, during manufacturing or processing, comes into direct contact with or results from the production or use of any raw material, intermediate product, finished product, by-product, or waste product."  40 C.F.R. § 63.101.

33.     Owners and operators of an affected source with process wastewater streams subject to the MON must comply with 40 C.F.R. §§ 63.132–63.148 in Subpart G – National Emission Standards for Organic Hazardous Air Pollutants from the Synthetic Organic Chemical Manufacturing Industry for Process Vents, Storage Vessels, Transfer Operations, and

Wastewater ("Subpart G").  There are certain exceptions to this requirement, none of which are relevant to this Complaint.

34.    A waste management unit ("WMU") is defined as "the equipment, structure(s), and/or device(s) used to convey, store, treat, or dispose of wastewater streams or residuals."  40 C.F.R. § 63.2550(i).

35.    Among other things, Subpart G requires owners or operators to: (1) treat or control Group 1 wastewater streams to remove or destroy organic HAPs, 40 C.F.R. § 63.138(b); (2) evaluate wastewater treatment processes to ensure that they remove or destroy organic HAPs appropriately, 40 C.F.R. § 63.138(a)(4); (3) adequately monitor wastewater treatment processes, 40 C.F.R. § 63.143 and Subpart G, Table 12; and (4) inspect WMUs managing Group 1 wastewater streams, 40 C.F.R. § 63.148(b)(3).

*MON Requirements for Batch Process Vents*

36.    A "batch process vent" is "a vent from a unit operation or vents from multiple unit operations within a process that are manifolded together into a common header, through which a HAP-containing gas stream is, or has the potential to be, released to the atmosphere." 40 C.F.R. § 63.2550(i).

37.    If a process has batch process vents, the owner or operator must determine the group status of the batch process vents by determining and summing the uncontrolled organic HAP emissions from each of the batch process vents within the process.  40 C.F.R. § 63.2460(b).

38.    If the collective uncontrolled organic HAP emissions from all the batch process vents in a process at an existing source is greater than or equal to 10,000 lbs/year, then each of the batch process vents in that process is a Group 1 process vent.  40 C.F.R. § 63.2550(i). Otherwise, each batch process vent is a Group 2 process vent.

39.     Under 40 C.F.R. § 63.2460(a), owners and operators must meet each emission limit in Table 2 of Subpart FFFF that applies to their batch process vents.

*MON Reporting and Recordkeeping Requirements*

40.     An owner or operator of an MCPU must submit to EPA and the authorized Title V permitting authority a Notification of Compliance Status ("NOCS") report, certified by a responsible official, no later than 150 days after the compliance date (May 10, 2008, for existing sources), or October 7, 2008.  40 C.F.R. §§ 63.2520(d), 63.2525.  The original NOCS report must include "results of any applicability determinations, emission calculations, or analyses used to identify and quantify HAP usage or HAP emissions from the affected source" and "results of emissions profiles, performance tests, engineering analyses, design evaluations . . . and calculations used to demonstrate initial compliance . . . ."  40 C.F.R. § 63.2520(d)(2).

41.     After the original NOCS report, an owner must submit Semi-Annual Compliance Reports ("SARs") to EPA and the authorized Title V permitting authority.  40 C.F.R. § 63.2520(b).

42.     If the owner or operator of an affected source makes (1) a process change, such as adding a new process; or (2) changes to any of the information included in the original NOCS report or a previous compliance report (that is not within the scope of an existing operating scenario previously reported), the owner or operator is required to notify EPA and the authorized Title V permitting authority in the next compliance report.  40 C.F.R. § 63.2520(b), (e)(10).  The required notification includes, but is not limited to, revisions to any of the information reported in the original NOCS report and, for the addition of any new processes, any information required to be in the original NOCS report.  40 C.F.R. § 63.2520(e)(10).

43. At all times relevant to this Complaint, the South Carolina Department of Health and Environmental Control ("SC DHEC") was an authorized permitting authority under Title V of the Clean Air Act, 42 U.S.C. § 7661–7661e.

44. Owners and operators must keep, among other things, (1) each applicable record referenced in Subparts G and UU, under 40 C.F.R. § 63.2525(a); (2) records demonstrating that the inspections required for waste management units were performed, under 40 C.F.R. § 63.147(b)(1); and (3) records documenting weekly visual inspections of pumps and agitators, under 40 C.F.R. § 1038(c)(2)(i), (4)(i).

45. Under 40 C.F.R. § 63.2525(b), owners and operators must keep certain records for each operating scenario, including but not limited to: the applicable control requirements of Subpart FFFF, including the level of required control, 40 C.F.R. § 63.2525(b)(3); and the applicable monitoring requirements of Subpart FFFF and any parametric level that assures compliance for all emissions routed to a control device or treatment process, 40 C.F.R. § 63.2525(b)(6).

46. Owners and operators must keep all required records in a form suitable and readily available for expeditious inspection and review and retain them for at least 5 years following the date of each occurrence, measurement, maintenance, corrective action, report, or record.  40 C.F.R. § 63.2540; Subpart FFFF, Table 12; 40 C.F.R. § 63.10(b)(1).

47. Under 40 C.F.R. § 63.2540, owners and operators must comply with the General Provisions of Part 63 that are listed in Table 12 to Subpart FFFF, which include, among other things, the requirements for a Startup, Shutdown, Malfunction Plan ("SSMP") in 40 C.F.R. § 63.6(e)(3)(i), (ii), and (v) through (viii), and the requirements for records related to startup,

shutdown, and malfunction events in 40 C.F.R. § 2520(e)(4)–(5), and 40 C.F.R.

§ 63.998(c)(1)(ii)(D)–(G), (d)(3).

48.    An SSMP must describe, "in detail, procedures for operating and maintaining the

source during periods of startup, shutdown, and malfunction" in order to "[e]nsure that, at all

times, the owner operates and maintains each affected source, including associated air pollution

control and monitoring equipment, in a manner which satisfies the general duty to minimize

emissions…."  40 C.F.R. § 63.6(e)(3)(i).

49.    An owner or operator may use the affected source's standard operating

procedures ("SOP") manual, or an Occupational Safety and Health Administration ("OSHA") or

other plan, provided the alternative plan meets all the applicable requirements for a SSMP.  40

C.F.R. § 63.6(e)(3)(vi).  An owner or operator must maintain a current SSMP at the affected

source and must make the plan available upon request by the Administrator.  40 C.F.R.

§ 63.6(e)(3)(v).

50.    For each startup, shutdown, and malfunction ("SSM") period during which excess

emissions occur through August 11, 2023, owners and operators must keep records

demonstrating that procedures in the SSMP were followed, and they must report on actions taken

during SSM periods in the SAR.  40 C.F.R. § 2520(e)(4)–(5).  These records may take the form

of a "checklist" or other form of recordkeeping that confirms conformance with the SSMP for

the event.  40 C.F.R. Part 63, Subpart FFFF, Table 12; 40 C.F.R. § 63.998(c)(1)(ii)(E), (d)(3)(ii).

**CAA Enforcement Authority**

51.    The Act authorizes EPA to bring a civil action in accordance with 42 U.S.C.

§ 7413(b), when EPA finds that any person has violated or is in violation of the

NESHAP/MACT program.  42 U.S.C. § 7413(a)(3).

52.    The Act authorizes the Administrator to initiate a judicial enforcement action for a permanent or temporary injunction and/or a civil penalty of up to $25,000 per day for each violation of the Act.  42 U.S.C. § 7413(b).  Under the Federal Civil Penalties Inflation Adjustment Act of 1990, the United States may seek penalties of not more than $121,275 per day for each violation occurring after November 2, 2015.

## GENERAL ALLEGATIONS

53.    The Facility is located at 2151 King Street Extension, Charleston, South Carolina 29405, on property of approximately 100 acres.

54.    The Facility was owned by Rhodia, Inc. ("Rhodia") from 2008 to 2011 and by Solvay USA Inc. ("Solvay") from 2011 until February 2018.

55.    On February 7, 2018, Defendant purchased the Facility and has been the "owner or operator" of the Facility under 42 U.S.C. § 7412(a)(9) and 40 C.F.R. § 63.2 since that date.

56.    SC DHEC issued the Facility a Title V permit (number TV-0560-0011) on April 29, 2008 (effective date July 1, 2008), and issued a renewed Title V permit on July 26, 2021 (effective date October 1, 2021).  Both the 2008 and the 2021 permits state that the Facility is subject to the MON.

57.     Since at least July 1, 2008, the Facility has been a major source of HAPs, under 42 U.S.C. § 7412, because it has been a stationary source located within a contiguous area under common control that has emitted, or had the potential to emit, 25 tons per year or more of any combination of HAPs, including 1,2-dichloroethane/ethylene dichloride ("EDC"), ethylene oxide ("EtO"), and ethylene glycol ("EG").

58.    From at least July 1, 2008, the Facility has manufactured, and continues to manufacture, several specialty chemical products in multiple manufacturing units.  These

products have many uses, including as flame retardants, lubricant additives, and oxidation inhibitors.

59.     At various times since at least February 7, 2018, Defendant has batch produced, and continues to produce, miscellaneous organic chemicals classified in the 1987 version of Standard Industrial Code 286 at the BISCEP and Ethephon MCPUs at the Facility.  These chemicals include BISCEP and Ethephon products.

60.     To produce miscellaneous organic chemicals at the Facility, Defendant runs a "process" within the meaning of 40 C.F.R. § 63.2550(i).

61.     At all times relevant to this Complaint, the BISCEP and Ethephon MCPUs each included valves, pumps, compressors, agitators, and other equipment.

62.     The equipment referred to in Paragraph 61 and each associated storage tank constitute MCPUs within the meaning of 40 C.F.R. Part 63, Subpart FFFF.

63.     The Facility's MCPUs are not an "affected source" or part of an "affected source" under another subpart to Part 63.

64.     The Facility's MCPUs process, use, or generate, among other chemicals, EDC, EtO, and EG.

65.     EDC, EtO, and EG are organic HAPs listed in 42 U.S.C. § 7412(b).

66.     At all times relevant to this Complaint, the equipment described in Paragraph 61 has been "in organic HAP service," within the meaning of 40 C.F.R. § 63.2550.

67.     At all times relevant to this Complaint, the equipment in the Facility's MCPUs has contained or contacted "regulated material" within the meaning of 40 C.F.R. §§ 63.1019(b), 63.1020.

68.     At the BISCEP and Ethephon MCPUs, the Facility has generated "Group 1 wastewater streams" as defined in 40 C.F.R. § 63.2550(i) and that meet the Group 1 criteria in 40 C.F.R. § 63.2485(c).

69.     The BISCEP MCPU generates Group 1 wastewater streams containing EDC and EtO, and the Ethephon MCPU generates Group 1 wastewater streams containing EDC.

70.     The Facility includes tanks that receive Group 1 wastewater streams. These tanks are "wastewater tanks" within the definition in 40 C.F.R. § 63.101 and "waste management units" within the meaning of 40 C.F.R. § 63.2550(i).

71.     The facility-wide collection of the MCPUs, the wastewater streams described in Paragraph 69, and the wastewater tanks described in Paragraph 70 constitute an "affected source" and an "existing source" under the MON within the meaning of 40 C.F.R. § 63.2.

*Defendant's and Prior Owners' Compliance Reports*

72.     Rhodia submitted the original NOCS report for the Facility to EPA and SC DHEC in October 2008 (the "2008 NOCS Report"). That report stated that the Facility's MCPUs were subject to the MON for the processes used to produce the chemicals listed in Paragraph 59, that the Facility had equipment subject to the MON's equipment leak requirements, that the Facility generated Group 1 wastewater streams subject to the MON's wastewater requirements, and that batch process vents were used in many of the Facility's MCPUs.

73.     In the 2008 NOCS Report, Rhodia reported that it would comply with MON leak detection and repair standards by complying with 40 C.F.R. Part 63, Subpart UU.

74.     In the 2008 NOCS Report, Rhodia reported that the BISCEP MCPU generated Group 1 and Group 2 wastewater streams, and the Ethephon MCPU generated Group 1 wastewater streams.

75.     In 2009, 2010, and 2011, Rhodia submitted to EPA and SC DHEC revisions of the 2008 NOCS Report.  In each of these revisions, Rhodia stated that the BISCEP and Ethephon MCPUs were subject to the MON and reported the same compliance selections for equipment leaks, Group 1 storage tanks, and wastewater streams as represented in the 2008 NOCS Report.

76.     In 2014, 2016, and 2018, Solvay submitted to EPA and SC DHEC revisions of the 2008 NOCS Report.  In each of these revisions, Solvay stated that the BISCEP and Ethephon MCPUs were subject to the MON and reported the same compliance selections for equipment leaks, Group 1 storage tanks, and wastewater streams as represented in the 2008 NOCS Report.

77.     Since taking ownership of the Facility in February 2018, Defendant has submitted SARs on a semi-annual basis purporting to document compliance with the MON to SC DHEC.  These SARs stated that the BISCEP and Ethephon MCPUs were subject to the MON.

*EPA Inspections of the Facility and Communications with Defendant*

78.     On December 7–8, 2015, representatives of EPA, along with representatives of SC DHEC, inspected the Facility for compliance with the MON, pursuant to Section 114 of the Act, 42 U.S.C. § 7414.

79.     During the 2015 inspection, Defendant was manufacturing BISCEP in the BISCEP MCPU and Ethephon in the Ethephon MCPU.

80.     On August 21–28, 2018, EPA inspected the Facility pursuant to Section 114 of the Act, 42 U.S.C. § 7414, and took samples of wastewater generated in the BISCEP and Ethephon MCPUs.

81.     EPA conducted two LDAR inspections at the Facility.  The first, conducted on February 11–13, 2019, focused on the BISCEP MCPU.

82.     EPA conducted a second LDAR inspection on May 20–22, 2019.  The May 2019 inspection focused on both the BISCEP and Ethephon MCPUs.

15

83.     During the 2018 and 2019 inspections, Defendant was manufacturing BISCEP in the BISCEP MCPU and Ethephon in the Ethephon MCPU.

## FIRST CLAIM FOR RELIEF
### (Violations of Leak Detection and Repair Requirements)

84.     Paragraphs 1–83 are re-alleged and incorporated herein by reference.

### *LDAR 1: Failure to Properly Identify and Record Subject Equipment*

85.     Defendant is required by 40 C.F.R. § 63.1022(a) to identify all of its equipment subject to Subpart UU, either through physical tagging or identification on a plant site plan, in log entries, by designation of process unit or affected facility boundaries by some form of weatherproof identification, or by other appropriate methods.

86.     Defendant uses an LDAR Component List as a means of written documentation and physical tagging to identify its equipment subject to Subpart UU.

87.     During both the February 2019 and May 2019 inspections, EPA found that Defendant's LDAR Component Lists for the BISCEP and Ethephon MCPUs were inaccurate and had not been updated or verified since 2008, when the Facility became subject to the MON.

88.     During both the February and May 2019 inspections, EPA observed various pieces of tagged and untagged equipment in the BISCEP and Ethephon MCPUs that Facility personnel, who conduct the LDAR monitoring for the Facility, were unable to locate on the LDAR Component List when asked.

89.     At the time of the February and May 2019 inspections, Defendant failed to identify all of its equipment subject to Subpart UU, either through physical tagging or through written documentation, in violation of 40 C.F.R. § 63.1022(a).

16

90.     At the time of the February and May 2019 inspections, Defendant failed to keep records identifying the Facility's regulated equipment that was not physically tagged, as required by 40 C.F.R. § 63.1038(b)(1).

*LDAR 2: Failure to Properly Calibrate Leak Detection Instrument*

91.     Defendant is required by 40 C.F.R. § 63.1023(a)(1) to use a leak detection instrument to monitor valves, connection systems, closed vent systems, and pumps and agitators at the Facility.

92.     Defendant uses a photoionization detector ("PID") to conduct LDAR monitoring on its equipment subject to the MON.

93.     The PID used by Defendant to monitor leaks at the Facility can calibrate on multiple scales.

94.     Pursuant to 40 C.F.R. § 63.1023(b)(4), Defendant must calibrate its leak detection instrument with three gases: zero gas (less than 10 ppm of hydrocarbon in air); for the lower scale, a calibration gas that is no higher than 2,000 ppm above the concentration specified as a leak; and, for the highest scale, a calibration gas that is approximately equal to 10,000 ppm.

95.     From February 7, 2018, to December 26, 2018, Defendant used two gases— ambient air, and 100 ppm of isobutylene gas—to calibrate the PID before monitoring its LDAR equipment, including equipment in the BISCEP Process.

96.     During the February 2019 inspection, EPA inspectors observed a calibration where Defendant personnel used 100 ppm of isobutylene gas and ambient air to calibrate the PID.

97.     From February 7, 2018, to December 26, 2018 and during the February 2019 inspection, Defendant failed to calibrate its leak detection instrument in compliance with 40 C.F.R. § 63.1023(b)(4).

*LDAR 3: Failure to Determine Appropriate Response Factors*

98.     Sections 8.1.1 and 8.1.1.3 of Method 21 require Defendant to determine a response factor for each compound that is to be measured before placing the PID into service, either by testing or by reference to a published response factor for the compound and PID.

99.     In April 2018, Facility personnel did not use the correct response factor in the PID for the chemical being monitored in the BISCEP MCPU.

100.     In April 2018, Defendant failed to comply with Sections 8.1.1 and 8.1.1.3 of Method 21 when monitoring its regulated equipment, in violation of 40 C.F.R § 63.1023(b)(1).

*LDAR 4: Failure to Conduct Calibration Precision Test & Response Time Test*

101.     Sections 8.1.2 and 8.1.3 of Method 21 require Defendant to complete a calibration precision test and a response time test before placing the PID into service.

102.     The calibration precision test must be completed at subsequent 3-month intervals or at the next use, whichever is later.

103.     Between February 2018 and August 2020, Facility personnel did not perform a response time test or a calibration precision test before placing the PID into service.

104.     Between February 2018 and August 2020, Defendant failed to comply with Sections 8.1.2 and 8.1.3 of Method 21, in violation of 40 C.F.R § 63.1023(b)(1).

*LDAR 5: Failure to Monitor Pumps & Agitators Monthly*

105.     Defendant is required by 40 C.F.R. §§ 63.1026(b) and 63.1028(c) to monthly check its regulated pumps and agitator seals for leaks.

106.     Defendant provided monitoring sheets for its valves, but not for its pumps or agitators, for February through July of 2018.

107.     For the months of February through July of 2018, Defendant was in violation of 40 C.F.R. §§ 63.1026(b) and 63.1028(c).

*LDAR 6: Failure to Visually Inspect Pumps & Agitators Weekly*

108.     Under 40 C.F.R. §§ 63.1026(b)(4) and (e)(1)(v), Defendant must visually inspect each pump weekly to check for indications of liquids dripping from the pump seal and document the date it conducted the inspection.

109.     Under 40 C.F.R. § 63.1028(c)(3) and (e)(1)(iv), Defendant must visually inspect each agitator seal weekly to check for indications of liquids dripping from the agitator seal, and document the date that it conducted these inspections.

110.     Between February 7, 2018, and May 20, 2019, Defendant failed to visually inspect its pumps and agitators weekly to check for indications of liquids dripping, in violation of 40 C.F.R. § 63.1023(a)(2)(i), (iii).

**SECOND CLAIM FOR RELIEF**
**(Violations of Wastewater Stream Requirements)**

111.     Paragraphs 1–83 are re-alleged and incorporated herein by reference.

112.     At all times relevant to this Complaint, Defendant has been required to comply with the requirements in 40 C.F.R. §§ 63.132–148 in 40 C.F.R. Part 63, Subpart G for each of its process wastewater streams.

*Wastewater 1: Failure to Control Group 1 Wastewater Streams in Accordance with Selected Compliance Option*

113.     Defendant was required by 40 C.F.R. § 63.138(a)(1) to comply with 40 C.F.R. § 63.138(b)(1) or (b)(2) to control its Group 1 wastewater streams.

114.     At least from September 12, 2018 through October 2, 2020, Defendant had selected the method under 40 C.F.R. § 63.138(b)(1).

115.     Under 40 C.F.R. § 63.138(b)(1)(ii), Defendant is prohibited from using dilution as a method of achieving compliance with 40 C.F.R. § 63.138(b)(1).

116.    Defendant has diluted Group 1 wastewater streams from the BISCEP and Ethephon MCPUs with Group 2 and nonregulated wastewaters.

117.    Defendant has failed to meet the wastewater control requirements in 40 C.F.R. § 63.138(a)(1).

*Wastewater 2: Failure to Conduct a Performance Test or Design Evaluation for the Wastewater Treatment Process*

118.    Under 40 C.F.R. § 63.138(a)(4), the Facility's owner or operator was required to perform either a design evaluation or performance test on the wastewater treatment process in accordance with 40 C.F.R. §§ 63.138(j) (design evaluation) or 63.145 (performance test).

119.    Neither Defendant nor any prior owner of the Facility has ever submitted any design evaluation or performance test to demonstrate that the two air strippers used to treat the BISCEP and Ethephon Group 1 wastewater streams can achieve the conditions specified for compliance in 40 C.F.R. § 63.138(b)(1) or (b)(2) via 40 C.F.R § 63.138(f).

120.    The original 2008 NOCS Report needed to include a design evaluation and supporting documentation or the performance test results for each treatment process, as required by 40 C.F.R. § 63.138(a)(4).  40 C.F.R. §§ 63.146(b), 2520(d)(2)(ii).

121.    Neither Rhodia's original NOCS Report from 2008 nor any of the subsequent report revisions include a design evaluation or a performance test for the two air strippers.

122.    At the time of the August 2018 inspection, Defendant was unable to locate or provide any documentation showing that either a design evaluation or a performance test for the two air strippers had ever been conducted.

123.    Defendant's failure to comply with the requirement set forth in 40 C.F.R. § 63.138(a)(4) is a violation of the MON's wastewater stream requirements in 40 C.F.R. § 63.2485(a) and Table 7 of Subpart FFFF.

*Wastewater 3: Failure to Properly Monitor Wastewater Treatment Processes*

124.    Defendant operates two air strippers and a thermal oxidizer to treat its Group 1 wastewater streams generated by the BISCEP and Ethephon MCPUs.

125.    Under 40 C.F.R. §§ 63.143(d) and 63.146(a), Item 3 in Table 12 of Subpart G, Defendant was required to monitor parameters that demonstrate proper operation of the selected treatment process and to submit a request for approval to use those alternative monitoring parameters.

126.    Defendant was monitoring certain parameters for the air strippers (air flow and water flow) at the time of the August 2018 inspection.

127.    Neither Defendant nor its predecessors ever requested, or obtained approval, to monitor these parameters to demonstrate proper operation of the air strippers.

128.    Defendant has not demonstrated that the parameters it is monitoring are intended to ensure adequate reduction of HAPs for Group 1 wastewater streams.

129.    Defendant is not performing required monitoring of its wastewater treatment process, in violation of 40 C.F.R. §§ 63.143(d), 63.146(a), and Table 12 of Subpart G.

*Wastewater 4: Failure to Properly Inspect Wastewater Management Units*

130.    For each wastewater tank that receives, manages, or treats a Group 1 wastewater stream or a residual removed from a Group 1 wastewater stream, Defendant must comply with either 40 C.F.R. §§ 63.133(a)(1) or (a)(2), depending on the tank's characteristics.

131.    Defendant's wastewater tanks fit the criteria for those that are regulated by 40 C.F.R. § 63.133(a)(1), which requires Defendant to operate and maintain a fixed roof.

132.    Under 40 C.F.R. § 63.148(b)(3), for each fixed roof, Defendant must conduct initial visual inspections and semi-annual inspections for visible, audible, or olfactory indications of leaks as specified in 40 C.F.R. §§ 63.133 through 63.137.

21

133.    Defendant manages Group 1 process wastewaters generated at the BISCEP and Ethephon processes in various tanks and individual drain systems.

134.    In August 2018, Defendant was unable to identify which of its tanks store Group 1 wastewaters.

135.    The WMU List from Defendant identifies seven wastewater management tanks (subject to 40 C.F.R. § 63.133(a)(1)) and one individual drain system associated with the BISCEP MCPU, the Ethephon MCPU, and/or the Thermal Oxidizer Unit.

136.    Defendant failed to visually inspect its tanks in violation of 40 C.F.R. § 63.148(b)(3), from February 2018 through at least September 2020.

### THIRD CLAIM FOR RELIEF
#### (Violation of Batch Process Vent Requirements)

137.    Paragraphs 1–83 are re-alleged and incorporated herein.

138.    Defendant is required by 40 C.F.R. § 63.2460(b) to properly determine the group status of its batch process vents associated with the BISCEP MCPU.  Batch process vents that produce more than 10,000 lbs/year of uncontrolled organic HAPs are in Group 1.

139.    For Group 1 batch process vents, Defendant is required by 40 C.F.R. § 63.2460(a) and Table 2 to Subpart FFFF to comply with applicable emission limits set forth in that table.

140.    The BISCEP MCPU processes or generates the following three organic HAPs: EtO, EDC, and EG.

141.    In the BISCEP MCPU, batch emissions occur in the Hold Tank Vent (D-4195), the Still Vent (D-4196), and the Stripper Vent (D-4205).

142.    The Facility's NOCS Reports show that these three batch process vents produce 9,039 lbs/year of uncontrolled organic HAPs, and that Defendant has designated these vents as Group 2 batch process vents.

143.    The NOCS Reports calculations only include EDC and EtO; they do not include EG.

144.    The NOCS Reports calculations do not include all the vessels in the BISCEP Process that contribute to its batch vent emissions.

145.    Defendant has failed to properly determine the group status of its batch process vents associated with the BISCEP MCPU, in violation of 40 C.F.R. § 63.2460(b).

**FOURTH CLAIM FOR RELIEF**
**(Violations of Reporting and Recordkeeping Requirements)**

146.    Paragraphs 1–83 are re-alleged and incorporated herein.

*Recordkeeping 1: Failure to Keep Records of Inspections and Operating Scenarios*

147.    Under 40 C.F.R. § 63.2540, Table 12 to Subpart FFFF, and 40 C.F.R. § 63.10(b)(1), Defendant must retain all required records for at least 5 years following the date of each occurrence, measurement, maintenance, corrective action, report, or record, and it must maintain the records in a form suitable and readily available for expeditious inspection and review.

148.    Defendant was unable to produce the following records at the time of the applicable inspections: (i) records documenting visual inspections of pumps and agitators; (ii) records documenting the control option it chose for its Group 1 wastewater streams; and (iii) records of applicable monitoring requirements that assure compliance.

149.    By failing to maintain these records in a form suitable and readily available for review at the time of the corresponding inspections, Defendant violated the recordkeeping requirements identified in the table, as well as 40 C.F.R. § 63.2540, Table 12 to Subpart FFFF, and 40 C.F.R. § 63.10(b)(1).

23

*Recordkeeping 2: Failure to Maintain a Complete Startup, Shutdown, Malfunction Plan*

150.    Defendant's SSMP refers to individual process SOPs for detailed instructions, including the SOPs for the BISCEP and Ethephon MCPUs.

151.    These SOPs do not identify steps associated with minimizing any emissions from the BISCEP and Ethephon MCPUs.

152.    Defendant must identify steps to minimize any emissions to ensure that it is operating and maintaining its MCPUs in a manner that satisfies the "general duty to minimize emissions."  40 C.F.R. § 63.6(e)(3)(i).

153.    The SOPs fail to include the recordkeeping requirements or reporting procedures for the SSMP, or to contain reporting forms for SSM periods, as required by 40 C.F.R. § 2520(e)(4)–(5); Subpart FFFF, Table 12; and 40 C.F.R. § 63.998(c)(1)(ii)(E), (d)(3)(ii).

154.    Between February 2018 and at least October 2020, Defendant's SSMP failed (i) to sufficiently describe "in detail" the procedures for operating and maintaining the source during periods of SSM events to ensure that it operates and maintains its MCPUs in a manner that satisfies the general duty to minimize emissions, in violation of 40 C.F.R. § 63.2540, Table 12 to Subpart FFFF, and 40 C.F.R. § 63.6(e)(3)(i); and (ii) to ensure that Defendant adequately keeps records and reports on actions taken during SSM events, as required by 40 C.F.R. § 2520(e)(4)–(5).

*Recordkeeping 3: Failure to Submit a Complete Semiannual Report*

155.    Defendant was required by 40 C.F.R. § 63.2520(b) and (e)(10)(i) to submit SARs including, among other things, documentation of any process changes or changes to any information submitted in the original NOCS Report in 2008.

156.    No later than October 2, 2020, Defendant switched its wastewater compliance option from 40 C.F.R. § 63.138(b)(1) to 40 C.F.R. § 63.138(b)(2) via 40 C.F.R § 63.138(f).

157.    No SAR submitted by Defendant to date has documented its decision to switch wastewater compliance options.

158.    The original NOCS Report needed to include documentation of a design evaluation or performance test results for each treatment process, as required by 40 C.F.R. § 63.138(a)(4).  40 C.F.R. §§ 63.146(b), 2520(d)(2)(ii).

159.    Neither the original NOCS Report in 2008 nor any SAR submitted since then has included the results of a performance test or design evaluation demonstrating the Facility's compliance with the performance standards for treating Group 1 wastewaters.

160.    Since February 2018, Defendant has failed to submit complete SARs that adequately document a change to the information submitted in the original NOCS Report.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, the United States of America, respectfully requests that this Court:

A.    Order Defendant to take all necessary steps to comply with the CAA and its implementing regulations at the Facility;

B.    Assess civil penalties against Defendant for each violation of the CAA and its implementing regulations as set out in this Complaint;

C.    Order Defendant to take appropriate steps, including but not limited to, mitigation of any excess emissions of HAPs resulting from the violations set out in this Complaint;

D.    Award the United States its costs in this matter; and

E.    Grant such other and further relief as this Court deems just and proper.

Respectfully submitted,


TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

/s/ *Stefan J. Bachman*
STEFAN J. BACHMAN (DSC #12373)
Senior Attorney
THOMAS A. LANDERS (MD Attorney
   #1812110216)
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
Stefan.Bachman@usdoj.gov
Thomas.Landers@usdoj.gov
Telephone: (202) 616-6536 (Bachman)
Fax: (202) 514-0097


Adair Ford Boroughs
United States Attorney
District of South Carolina


LEE E. BERLINSKY (DSC #5443)
Assistant United States Attorney
151 Meeting Street, Suite 200
Charleston, South Carolina 29401
Telephone: (843) 266-1600
lee.berlinsky@usdoj.gov


OF COUNSEL:

MARIROSE J. PRATT
Associate Regional Counsel
U.S. EPA Region IV
61 Forsyth Street, S.W.
Atlanta, Georgia 30303